**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>     vs.<br><br>BRANDON SMITH,<br><br>            Defendant. | 3:16-cr-00008-RCJ-VPC<br><br>**ORDER** |

A grand jury has indicted Defendant Brandon Smith ("Defendant") on one count of Felon in Possession of Ammunition, 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Now pending before the Court is Defendant's Motion to Suppress Evidence. (ECF No. 30.) For the reasons stated below, the Court denies the motion.

**I.        FACTS AND PROCEDURAL HISTORY**

On the morning of December 21, 2015, Reno Police Department ("RPD") officers responded to the area of 5th Street and Virginia Street to several reports of shots fired. (Police Report 8, ECF No. 31-2 at 9.) Dispatch also reported that a gold or tan vehicle was seen leaving the area after the shooting. (*Id.*) Officers were unable to find any victims or the suspect vehicle, but recovered twelve .40 caliber shell casings in the parking lot of the Monte Carlo Motel, located at 500 North Virginia Street. (*Id.*) A silver Volkswagen Touareg with no plates was found parked on the north side of Virginia Street just outside the Monte Carlo, with four bullet

strikes on or around the rear passenger-side door. (*Id.*) In addition, a window above the front entrance doors of the Silver Legacy Hotel and Casino had been struck, but not penetrated, by a bullet. (*Id.*)

Two witnesses near the scene reported hearing gunshots and seeing a gold, light brown, or tan four-door sedan leave the area immediately after the shooting stopped. (*Id.* at 8–9, ECF No. 31-2 at 9–10.) On surveillance video of the Monte Carlo parking lot, RPD officers observed one black male and two white females walking down a stairwell and across the lot toward the intersection of 5th and Virginia Street. (*Id.* at 9, ECF No. 31-2 at 10.) A light-colored four-door sedan reversed from the far east parking space, and the vehicle's driver opened the door, placed his left foot outside the car but remained seated in the driver's seat, and started shooting in the direction of the black male and two white females. (*Id.*) The vehicle then reversed onto 5th Street and turned south into the alley between Center Street and Virginia Street. (*Id.*) However, no witnesses got a good look at the driver, and the surveillance video is not clear enough to allow an identification.

On the morning of December 23, 2015, RPD officers located the suspect vehicle in the parking lot of the Castaway Motel at 525 West Second Street. (Supp. Report #5 at 2, ECF No. 31-8 at 3.) Surveillance video from the scene of the shooting and photographs of the suspect vehicle in the Castaway Motel parking lot appear to depict the same car: a gold four-door sedan with apparent collision damage around the driver-side headlight and a mismatched, black-rimmed tire on the front driver's side. (*See* ECF Nos. 31-1, 31-6, 31-7.) Officers determined the registered owner of the vehicle was Delpha Kennison and that Kennison was a resident of the Walker River Indian Reservation in Schurz, Nevada. (Supp. Report #5 at 2, ECF No. 31-8 at 3.) Officers contacted the chief of police in Shurz, who told the officers that Kennison lived on the reservation with her family and a boyfriend known as "Texas." (*Id.*) The chief also told the

officers that Texas's real name is Brandon Smith. (*Id.*) Officers ran Brandon Smith's information and determined that he had a criminal history and roughly matched the build of the shooter from the Monte Carlo Motel. (*Id.*)

At around noon on December 23, RPD officers knocked on the door of room 24 at the Castaway, which they had verified with the manager's office was Brandon Smith's room. (*Id.*) The room's registered tenant, Jay Long, answered the door and told officers that Smith and Kennison were sleeping in the room. (*Id.*; Supp. Report #7 at 5, ECF No. 31-9 at 6.) Long consented to the officers' entry, and the officers went in and woke up Smith and Kennison. (Supp. Report #7 at 5, ECF No. 31-9 at 6.) Defendant identified himself as Brandon Smith, and was placed under arrest for outstanding warrants. (*Id.*) After being handcuffed, Defendant asked one of the officers if they were there because of the shooting at the Flamingo Motel. (*Id.*) An officer asked Defendant if he wanted to speak with her at the station and Defendant agreed. (*Id.*) Defendant then volunteered: "[T]hat fool shot me first . . . so I shot him back." (*Id.*) Defendant stated that he had a gunshot wound over his ribs on his right side. Officers examined the wound and saw bruising and swelling. (*Id.*) The officer asked Defendant if he needed medical attention, but he declined. (*Id.* at 6, ECF No. 31-9 at 7.)

Long and Kennison gave the officers permission to search the motel room and Kennison's car. (*Id.*) No firearm was found, but a .40 caliber Smith and Wesson magazine was discovered in the car. (*Id.*) Officers told Long why they were there and Long agreed to talk to them. (Supp. Report #6 at 1, ECF No. 31-10 at 2.) Long stated he was aware of "the shooting" because he had heard Defendant and Kennison talking about it a couple of days prior. (*Id.*) However, the police report is not clear whether Long was referring to the shooting that caused Defendant's wound or the shooting captured on surveillance video at the Monte Carlo. Long had

also recently seen Defendant with a black, semiautomatic firearm—possibly a .45 caliber—but didn't know where it currently was. (*Id.*)

Officers then spoke to Kennison at the Castaway Motel, and she was also cooperative. (*Id.*) She stated that "this was a self-defense situation." (*Id.*) She said she had been shot at by an unknown male while sitting in the passenger seat of her vehicle near the Flamingo Motel, but the bullet missed her and struck Defendant in his right side. (*Id.*) Kennison was then interviewed again at the Reno police station. (*See* Kennison Interview, ECF No. 31-11.) She identified the man who shot Defendant as "Shit Bag T." (RPD later confirmed that Shit Bag T is Thomas Lamont Williams ("Williams").) (Supp. Report #7 at 6, ECF No. 31-9 at 7.) Kennison said Defendant and Williams were former cellmates and had bad blood from their time in prison. (*See* Kennison Interview, ECF No. 31-11.) Following some disputes, Williams was moved to another cell, and since Defendant and Williams have been released, Williams has harassed Defendant and Kennison and tried to "start stuff" with them on several occasions.

Kennison stated that on the night of December 19 or 20, 2015, while Defendant, Kennison, and a friend were in the parking lot of the Flamingo Motel, Williams fired one shot through the front passenger-side window of Kennison's car, and the bullet struck Defendant in his upper right side. The next day, Smith said he had to go do "some things," took Kennison's car, and told Kennison to stay at the Castaway while he was gone. (*Id.*) When Defendant returned to the Castaway after the shooting at the Monte Carlo, he told Kennison, "I think I got him." (*Id.*) When asked by the interviewing officer how Kennison interprets Defendant's statement, Kennison said: "What everybody interprets that as. . . . My husband either went and beat him up, or it got serious and he's dead." Kennison further stated that Defendant told her there were two women with Williams at the Monte Carlo, and that one of the women "started firing at him so he shot back." (*Id.*) Kennison also said that Defendant went out and got a black

semiautomatic handgun after being shot by Williams, which Kennison saw and handled prior to the Monte Carlo shooting. (*Id.*) She doesn't know where Defendant got the gun or what happened to it. (*Id.*)

At the police station, Defendant was read his Miranda rights and agreed to speak to an RPD officer. (*See* Smith Interview, ECF No. 31-12.) Defendant admitted to being the shooter at the Monte Carlo hotel on December 21, 2015. (*Id.*) Specifically, Defendant stated that he had an altercation with his former cellmate, Williams. (*Id.*) Defendant and Williams did not get along as cellmates because Williams would rinse out his colostomy bag in their shared sink. (*Id.*) Both Smith and Williams had been released from prison and had recently run into each other multiple times in downtown Reno, during which encounters Williams had threatened Defendant and Kennison. (*Id.*) Defendant claimed that Williams had shot him outside the Flamingo Motel. (*Id.*) After being shot, Defendant did not go to the hospital because he knew the police would be called due to the nature of the injury. (*Id.*)

After Defendant was shot at the Flamingo, he went to a friend's house and borrowed a black, semiautomatic handgun.[1] (*Id.*) He then went to the Monte Carlo Motel to conduct surveillance on the Flamingo Motel and to look for Williams. (*Id.*) Defendant saw Williams come down a stairwell at the Monte Carlo with two light-skinned women. (*Id.*) Defendant said he heard a gunshot and saw Williams reach for a gun, so he opened fire. (*Id.*)

Defendant now moves for an order suppressing his confession on the basis of the *corpus delicti* rule, arguing that the government has insufficient independent evidence to corroborate the confession and that the confession is unreliable. (*See* Mot. Suppress, ECF No. 30.)

---

[1] Defendant initially stated he had borrowed a small bat, and later changed his story to indicate he borrowed a BB or pellet gun powered by a $CO_2$ cartridge. He eventually admitted he had lied and that he actually borrowed a handgun.

## II. LEGAL STANDARDS

Under the *corpus delicti* rule, the government may rely on a criminal defendant's confession to meet its burden of proof; however, in order for the confession to "serve as the basis for conviction, the government must also adduce some independent corroborating evidence." *United States v. Corona-Garcia*, 210 F.3d 973, 978 (9th Cir. 2000) (citing *Opper v. United States*, 348 U.S. 84, 89 (1954)). The "contemporary iteration" of the rule does not require the government to "introduce independent, tangible evidence supporting every element of the *corpus delicti*. Instead, the state is required to support independently only the gravamen of the offense— the existence of the injury that forms the core of the offense and a link to a criminal actor—with tangible evidence." *United States v. Valdez-Novoa*, 780 F.3d 906, 922 (9th Cir.), *cert. denied*, 135 S. Ct. 2913 (2015) (quoting *United States v. Lopez–Alvarez*, 970 F.2d 583, 591 (9th Cir. 1992).

The Ninth Circuit applies a two-prong test to determine whether sufficient evidence corroborates a defendant's confession:

> [F]irst, [the government] must introduce sufficient evidence to establish that the criminal conduct at the core of the offense has occurred. Second, it must introduce independent evidence tending to establish the trustworthiness of the admissions, unless the confession is, by virtue of special circumstances, inherently reliable. Only when both these prongs are satisfied will a jury be "sufficiently justified" in believing the truth of a criminal admission; only then will the evidence be deemed sufficient in a case in which the conviction depends in part on such admission.

*Lopez-Alvarez*, 970 F.2d at 592.

## III. ANALYSIS

Here, the core, or gravamen, of the offense charged is the possession of ammunition. The government has identified more than enough evidence establishing the core of the offense to corroborate the defendant's confession. For example, Ms. Kennison's vehicle is seen in

surveillance video captured on December 21, 2015, in the parking lot of the Monte Carlo Motel, which depicts a man in the driver's seat of the car firing a gun toward the intersection of 5th Street and Virginia Street, in the direction of one black man and two white women. This is consistent with both Kennison's and Defendant's independent statements.

Two witnesses, Kennison and Long, said Defendant had been shot prior to the shooting at the Monte Carlo. Kennison stated that it was Defendant's former cellmate Williams who shot Defendant, which she witnessed firsthand. Furthermore, both Kennison and Long said they saw Defendant with a black semiautomatic handgun prior to the day of the Monte Carlo shooting. Kennison stated Defendant had acquired the gun after being shot by Williams.

Kennison also said that Defendant borrowed her car to go take care of "some things," and that when Defendant returned with the car, he told Kennison he "thought he got" Williams. Twelve .40 caliber shells were recovered at the site of the shooting, and an empty .40 caliber clip was recovered in Kennison's car.

All of this evidence is circumstantial; however, "the *corpus delicti* rule does not require the government to introduce evidence that would be independently sufficient to convict the defendant in the absence of the confession. Rather, it requires evidence sufficient to corroborate the defendant's confession." *Valdez-Novoa*, 780 F.3d at 923. Here, the evidence corroborates Defendant's admissions in that Defendant's description of events largely conforms to the physical evidence and witness accounts.

With respect to the second prong, the same facts that corroborate Defendant's confession to the conduct at the core of the offense also verify the "trustworthiness of the admissions." *See id.* at 924. Kennison and Defendant were interviewed separately, and their statements are consistent. Moreover, all of the evidence offered by the government comports with very specific

details provided by Defendant about his connection and history with Williams, and his intent and motivation in shooting at Williams.

The only notable fact on which Defendant's statement differs from the government's independent evidence concerns whether Defendant shot at Williams from Kennison's car, or whether he exited the car and then began shooting. The surveillance video clearly shows the suspect shooting while seated in the driver's seat of Kennison's car. However, Defendant was adamant in his police interview that he did not shoot from the car. Rather, Defendant maintained that after seeing Williams and the two white females pass behind his vehicle, he reversed the car and stepped out. At this time, he said his gun was in his waistband and nothing was in his hands. He then walked four or five feet away from the car, and one of the women with Williams said, "Look at that bitch right there"—presumably referring to Defendant. One of the women then started pull something from her bag, and Defendant heard a gunshot. Williams spun around and started to reach for something under his sweater. Defendant saw that it was a gun and started firing. At the time he started shooting, Defendant said he was about ten feet away from where Williams was standing. (*See* Smith Interview, ECF No. 31-12.)

This account clearly does not match what is depicted in the surveillance video. However, the fact that Defendant's statement contradicts the evidence against him does not suggest that his statement is not trustworthy. In fact, it likely indicates that the portion of his statement constituting a confession is *more* reliable, because it is clear he felt free to challenge the narrative proposed by the interviewing officer. "At bottom, the *corpus delicti* doctrine's 'purpose is to prevent errors in convictions based upon untrue confessions alone' in light of the reality that '[c]onfessions may be unreliable because they are coerced or induced.'" *Id.* (quoting *Smith v. United States*, 348 U.S. 147, 151, 153 (1954)). There is no indication that Defendant's confession was coerced. On the contrary, Defendant stuck to his story even when the

interviewing officer intimated he was lying. Furthermore, the confession can be considered "inherently reliable," *Lopez–Alvarez*, 970 F.2d at 592, because it was videotaped, voluntary, and occurred after Defendant was advised of his Miranda rights. *See Valdez-Novoa*, 780 F.3d at 925. "Where the government complies with all of the procedural protections afforded the accused and the defendant's videotaped statement is shown to the jury, there is no elevated risk that the confession was the product of coercion or that the defendant's words were misconstrued." *Id.*

On the other hand, Defendant argues his confession is not reliable because he is uneducated (although he passed a GED test), and at the time of the confession he was suffering from a gunshot wound and was under the influence of Xanax and alcohol. (Reply 4–6, ECF No. 33.) It is true that during his confession Defendant appeared somewhat lethargic and was speaking softly and sometimes slurring his speech. Defendant also said that he had taken Xanax and drunk a fifth of tequila after he was shot by Williams, so he may still have been under their influence.

However, it is clear from the video that Defendant understood his situation and was making his statement voluntarily. Notably, Defendant had the presence of mind to fabricate certain facts, to know which incriminating facts would get him into trouble, to anticipate where the interviewing officer was going with her questions, and to understand that the evidence against him was likely to put him in prison. (*See* Smith Interview, ECF No. 31-12.) For example, Defendant initially stated he was not driving Kennison's car when he went to look for Williams, and was only armed with a small bat that he had borrowed from a friend. However, after learning he had been captured on surveillance video and that the police had already taken Kennison's statement, Defendant admitted he was driving Kennison's car, and stated he had actually borrowed a BB or pellet gun from his friend, which he fired at Williams. Upon hearing some of the sources of evidence against him, Defendant said, "I'm probably going back to prison, too . . .

Because I see where this is going." When the interviewing officer called him out on his lie about having a BB gun, Defendant said, "I'm just not trying to go back to prison." Lastly, prior to confessing to firing an actual handgun, Defendant asked, "Will you just do two things and then I can just break everything down?"—implying that he would tell the whole truth after the interviewing officer let him smoke a cigarette and speak to Kennison.

Defendant had been shot, and was likely in some pain and possibly intoxicated at the time of his police interview. However, the video does not suggest that any discomfort he may have felt had any effect on the trustworthiness of his confession. Moreover, the video reveals that his memory was clear, his analytic abilities were intact, and he fully understood the nature and gravity of his situation. There is no indication that his admissions are not trustworthy.

Accordingly, the Court finds the government's evidence is sufficient to corroborate Defendant's confession, and there is no bar to receiving the confession in evidence on the basis of the *corpus delicti* rule.

## CONCLUSION

IT IS HEREBY ORDERED that Defendant's Motion to Suppress Evidence (ECF No. 30) is DENIED.

IT IS SO ORDERED.

_____
ROBERT C. JONES
United States District Judge
February 15, 2017